MARVIN CREWDSON, PERSONAL REPRESENTATIVE OF THE ESTATE OF DAN L. CREWDSON, APPELLEE, V. BURLINGTON NORTHERN RAILROAD COMPANY, APPELLANT.

452 N.W.2d 270

Filed March 9, 1990. No. 87-296.

632

Richard A. Knudsen, Steven D. O'Brien, and Thomas L. Beam, of Knudsen, Berkheimer, Richardson & Endacott, for appellant.

Vard R. Johnson, of Broom, Johnson, Fahey & Clarkson; Peter J. Hoagland; and Toney J. Redman for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

Burlington Northern Railroad Company (BN) appeals a $510,000 verdict awarded by a Lancaster County jury for the wrongful death of Dan L. Crewdson.

We affirm the jury's finding of liability on the part of BN, find the verdict excessive, and remand the cause for a new trial on damages only.

Twenty-one-year-old Dan Crewdson was killed instantly about 6:30 a.m. January 30, 1984, when the car he was driving in a southerly direction on a rural road was hit broadside by an eastbound BN freight train at a railroad crossing near his home.

Marvin Crewdson, the decedent's personal representative

and father, filed a wrongful death action against BN, alleging that the railroad was negligent. The jury found that BN was negligent, and its damage award was to compensate for the expense of Dan Crewdson's funeral and burial and pecuniary loss to his next of kin by reason of Crewdson's death.

BN assigns 10 errors, which may be summarized as that the trial court erred: (1) in failing to sustain BN's motions for a directed verdict and for judgment notwithstanding the verdict, based upon the insufficiency of evidence and alleged contributory negligence of the decedent; (2) in three evidentiary rulings; (3) in its instructions to the jury; and (4) in not vacating the damages award as excessive.

In reviewing a civil case, this court considers the evidence most favorably to the successful party and resolves evidential conflicts in favor of such party, which is entitled to every reasonable inference deducible from the evidence. A civil verdict will not be disturbed unless clearly wrong. *Blanchette v. Keith Cty. Bank & Trust Co.*, 231 Neb. 628, 437 N.W.2d 488 (1989); *Fisher Corp. v. Consolidated Freightways*, 230 Neb. 832, 434 N.W.2d 17 (1989).

Taking the view most favorable to the plaintiff, a jury could find by a preponderance of the evidence the following:

At the time Dan Crewdson was killed, it was cold and dark. The accident occurred at a grade crossing consisting of a two-lane gravel road running north and south which was intersected by four sets of railroad tracks running east and west. The crossing was not protected by warning lights or gates. The crossbuck warning sign north of the crossing had been broken for a number of years.

The Crewdson family home was located about 1,000 feet north of the railroad crossing. Dan Crewdson, who lived with his parents, used the crossing several times a day. On the morning of the collision, Crewdson and his fiancee, Jody Jones, left the Crewdson home about the same time, but in separate vehicles. Jones left first, and was traveling 5 to 10 seconds in front of the decedent.

At the time of the collision, a 1¼-mile-long coal train, headed east, was parked about 17 feet west of the crossing on the second track Crewdson needed to cross. As Crewdson

attempted to cross the third track, his vehicle was struck by an eastbound Portland Birmingham Freight (PBF) traveling 55 m.p.h. The decedent's vehicle was assumed by plaintiff's expert to be traveling at about 5 m.p.h.

Jones, who safely crossed the tracks in front of Crewdson, testified she thought her fiance was using his car's heater fan and was listening to the radio at the time of the collision. It is undisputed that the PBF began sounding its whistle one quarter of a mile from the crossing.

BN first assigns as error the trial court's failure to sustain its motions for a directed verdict at the close of the plaintiff's case and at the close of all the evidence and its motion for judgment notwithstanding the verdict.

A directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, where an issue should be decided as a matter of law. In reviewing a directed verdict, the party against whom a motion for a direction of liability is made is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989).

From the evidence, the jury could, and obviously did, find that BN was negligent in one or more of the following particulars: in failing to (1) provide adequate warning at an extrahazardous crossing when a parked coal train obstructed Dan Crewdson's view of an approaching train, (2) follow its own rule of not allowing a train to stand within 200 feet of a public crossing; (3) adequately flag the crossing; (4) keep an adequate lookout for motor vehicles approaching the crossing; (5) provide adequate warning with the locomotive whistle; and (6) provide flashing signals, gates, or other signals to adequately protect approaching motorists.

## DECEDENT'S ALLEGED CONTRIBUTORY NEGLIGENCE

BN claims its motions for a directed verdict should have been

sustained because Dan Crewdson was contributorily negligent as a matter of law in a degree more than slight and sufficient to bar recovery. The appellant argues that Crewdson had a duty to look and listen for the train and to keep his car under such control that he could stop to avoid a collision. The railroad claims that the parked coal train is not evidence of negligence, but that it heightened Crewdson's duty because his vision was obstructed. Because Crewdson did not stop to avoid the collision, and because he was using his car's heater fan and radio, BN asserts that Crewdson was sufficiently contributorily negligent to bar plaintiff's recovery as a matter of law.

A motorist approaching a railroad crossing has a duty to look and listen at a time and place where looking and listening will be effective to prevent an accident. Such motorist also has a duty to stop where a reasonably prudent person would have considered a stop necessary under the circumstances. See *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988). See, also, Neb. Rev. Stat. § 39-655 (Reissue 1988); *Neusbaum v. Chicago & N. W. Ry. Co.*, 162 Neb. 754, 77 N.W.2d 299 (1956); *Crabtree v. Missouri P. R. Co.*, 86 Neb. 33, 124 N.W. 932 (1910).

Failure to observe these rules may be evidence of negligence; however, it is not contributory negligence as a matter of law. If there is a reasonable excuse for not seeing an approaching train, such as an obstruction preventing one from seeing the train or a distraction diverting the attention, the question whether conduct in traversing a railroad crossing is reasonable is a matter for the jury. *Anderson v. Union Pacific RR. Co., supra.*

In *Anderson v. Union Pacific RR. Co., supra*, the plaintiffs' semitrailer truck was damaged when struck by a train at a public crossing containing three sets of railroad tracks. Seventeen empty hopper cars had been parked 218 feet east of the crossing. The plaintiffs alleged that the location of these empty cars created a dangerous and hazardous railroad crossing. Union Pacific claimed that the plaintiffs' agent was contributorily negligent because of his failure to comply with the above-stated duties to look, listen, and stop.

In determining contributory negligence, this court

considered the "dangerous trap doctrine," citing the Louisiana appellate court with approval:

> " '[I]f a [railroad] crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warnings and providing signaling devices, etc. The theory of this doctrine is that the railroad may not rely upon the duty of the motorist to stop and look, if the physical circumstances are such that stopping and looking will do the motorist no good.' "

*Anderson, supra* at 330, 426 N.W.2d at 523, citing *Bertrand v. Missouri Pacific Railroad Company*, 160 So. 2d 19 (La. App. 1964).

Resolving controverted facts most favorably to the plaintiff, the evidence shows that the coal train was parked 17 feet from the crossing Crewdson attempted to traverse. That train extended for $1^1/_4$ miles and included cars between 12 feet 5 inches and 17 feet 3 inches tall. A jury could reasonably find that Crewdson's view of the BN freight train involved in the accident was so obstructed as to require that he place himself in a position of peril before he could see the oncoming train.

The jury could further find that any alleged or proven warning by the flagman at the crossing was inadequate. The jury could also find that the flagman should have positioned himself on the north rather than the south side of the tracks on which the PBF was traveling. Whether the flagman's performance was adequate was a jury question. Under the circumstances, whether Crewdson's attempt to traverse the crossing constituted contributory negligence sufficient to bar the plaintiff's recovery was not a question of law, but was a question of fact for the jury. The trial court was correct in refusing to direct a verdict.

BN also assigns as error the trial court's failure to set aside the verdict for insufficient evidence and failure to find that Crewdson was contributorily negligent sufficient to bar

recovery as a matter of law. Those assignments of error are without merit.

## EVIDENTIARY RULINGS

BN claims the trial court erred in three evidentiary rulings.

It is within the trial court's discretion to admit or exclude evidence, and such rulings will be upheld on appeal absent an abuse of discretion. *State v. Sutton*, 231 Neb. 30, 434 N.W.2d 689 (1989).

On cross-examination, Jones was asked by BN's counsel:

> Q. You think that the condition of the road had anything to do with this accident?
>
> A. Possibly.

On redirect examination by plaintiff's counsel, Jones was asked:

> Q. . . . Jody, do you think that that condition with the parked coal train right up next to the road . . . had anything to do with this accident?
>
> . . . .
>
> [A.] If the train hadn't been there, there wouldn't have been an accident.

Jones' answer was given over objection by the railroad. BN argues that this testimony was inappropriate speculation on the part of a lay witness. The court did not abuse its discretion in permitting Jones to comment upon the factors responsible for the accident, when the railroad opened the door on cross-examination to that kind of inquiry.

BN argues that Deputy Sheriff Emanuel Bartek should not have been permitted to testify that Michael Smith, BN's flagman, was evasive in responding to the deputy's questions. The railroad made no objection to this testimony at the time it was offered at the trial. To preserve a claimed error in admission of evidence, a litigant must make a timely objection which specifies the ground of the objection to the offered evidence. *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989).

The appellant failed to preserve this claimed error, and we will not consider it.

Finally, BN argues that the court erred in permitting the expert testimony of retired State Patrol Major Eugene

Morrissey as to whether the railroad's flagman performed adequately. The admission or exclusion of expert testimony is within the discretion of the trial court. To obtain reversal on the grounds of the exclusion of evidence, an abuse of discretion must be shown. *Sanchez v. Derby*, 230 Neb. 782, 433 N.W.2d 523 (1989).

Morrissey was properly qualified as an expert witness. The railroad has made no showing that his testimony constituted an abuse of discretion.

The trial court did not abuse its discretion in admitting any of the complained-of testimony.

## JURY INSTRUCTIONS

BN assigns as error the trial court's failure to give seven of its proposed jury instructions. The appellant also claims that three of the instructions given to the jury were erroneous. It is the duty of a trial court to instruct the jury only on issues which are pled and find support in the evidence. *Blanchette v. Keith Cty. Bank & Trust Co.*, 231 Neb. 628, 437 N.W.2d 488 (1989). Instructions must be read together, and if taken as a whole they correctly state the law, are not misleading, and adequately cover the issues, there is no prejudicial error upon which a reversal on appeal may be based. *Zeeb v. Delicious Foods*, 231 Neb. 358, 436 N.W.2d 190 (1989).

The railroad first complains on appeal that portions of instruction No. 2, given to the jury, are in error. Although BN objected to one portion of instruction No. 2 at the instruction conference, it did not object to those portions of which it now complains. Under the circumstances, objections to those portions of the instruction not raised at the instruction conference have been waived. See *Omaha Mining Co. v. First Nat. Bank*, 226 Neb. 743, 415 N.W.2d 111 (1987).

Instruction No. 9 is also challenged by the appellant. That instruction states:

> If you find by a preponderance of the evidence that the crossing was peculiarly or unusually hazardous and that the railroad company knew or should have known, in the exercise of ordinary care, that the crossing was more than ordinarily dangerous, then in that event the railroad

company has the duty to provide active warning signals such as an adequate flagman, gates or electric signals.

In determining whether the crossing was more than ordinarily dangerous so as to require additional crossing protection, you may take into consideration whether the ordinary statutory crossbuck signs were sufficient as a warning to travelers about to make use of the crossing, and whether the warning devices maintained on the train, such as the whistle, were adequate to properly warn travelers of danger. You may also consider the approaches to the crossing, the condition of the approaches, the obstructions, if any, to the view of the crossing to a traveler approaching the intersection, the amount of traffic using the crossing and all other relevant facts and circumstances which, in the exercise of ordinary care, would require active warning signals such as an adequate flaging [sic], gates or electric signals.

The railroad argues that this instruction is an erroneous statement of the law because it permits the jury to consider "all other relevant facts and circumstances." According to the appellant, the instruction also improperly allows the jury to consider the adequacy of the train's whistle even though it conforms to federal law. Appellant's contention that the whistle conforms to federal law is not supported by the evidence.

Furthermore, the instruction does correctly state the law pertaining to railroad crossings which are more than ordinarily hazardous. In *McQuin v. Missouri P. R. Corporation*, 122 Neb. 423, 240 N.W. 515 (1932), this court discussed crossings that are more than ordinarily hazardous or dangerous. A jury instruction is warranted where "there is evidence that such crossing is rendered more than ordinarily hazardous and dangerous *by the conditions surrounding the same*, and that the ordinary signals may be ineffective to warn travelers of the approach of a train." (Emphasis supplied.) *Id*. at 435-36, 240 N.W. at 521. Any "condition" affecting the danger of a crossing may be considered by a jury in determining whether the crossing is extrahazardous. See, also, *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988).

There is evidence in the record from which a jury could find by a preponderance of the evidence that the crossing at which Crewdson was killed was more than ordinarily dangerous. Instruction No. 9 is a correct statement of the law and is supported by the evidence.

The last instruction with which BN takes issue is instruction No. 11. The appellant argues that this instruction is erroneous because it fails to include the obligations of a motorist approaching a railroad crossing. Instructions Nos. 12, 13, 14, 15, 17, 18, and 19 set out a motorist's duties in ample detail.

When read as a whole, the court's instructions to the jury are a correct statement of the law, are not misleading, and adequately cover the issues. There is no error in the instructions given to the jury.

BN also complains that seven of its proposed instructions were not given to the jury. The railroad's proposed instruction No. 5 represents the rule that negligence must be proven and that the burden of proof is on the party asserting negligence. The court's instruction No. 2 adequately stated this proposition of law.

Proposed instruction No. 9 states the duties of the motorist and railroad company at a crossing. As stated above, the duties of both parties are covered in other instructions given by the court.

Instruction No. 14 proposed by the railroad gives the motorist an increased duty to listen where his or her view of a crossing is obstructed. The proposed instruction, as written, is not a correct statement of the law. See *Anderson v. Union Pacific RR. Co., supra.*

BN's proposed instruction No. 15 would have told the jury that railroad employees in charge of a train are entitled to rely upon the motorist's duty to stop and need only exercise ordinary care. There is no evidence that the crew of the PBF which struck Crewdson's car saw the vehicle prior to the collision. Moreover, if the jury found the crossing to be unusually dangerous because of the parked coal train, the railroad was not entitled to rely upon the motorist's duty to stop. See *Anderson v. Union Pacific RR. Co., supra.*

The railroad's proposed instruction No. 16 would have

charged the jury that the coal train's standing on the track does not constitute negligence but, rather, imposes a higher duty upon the motorist. This is not a correct statement of the law. See *Anderson v. Union Pacific RR. Co., supra.*

BN's proposed instruction No. 17 was intended to inform the jury that "[t]he mere negative testimony of a witness that he did not see the flagman does not overcome positive testimony that the flagman was positioned on the crossing." BN points to the following testimony of Jody Jones:

Q. And did you see that man any more as you went on across?

A. No, I looked back to the road.

Q. He left your vision?

A. Yes.

Q. You never did see him again?

A. No.

BN argues that its proposed instruction No. 17 was "critical to the Railroad's case because all of the positive testimony was that Mike Smith was flagging the crossing as Decedent attempted to cross. Appellee attempted to rebut this evidence through Jody Jones . . . ." Brief for appellant at 38. BN's argument is meritless for two reasons: (1) It was BN that elicited the testimony of Jones of which the defendant complains; and (2) the above testimony is neutral, not negative, and clearly does not support the giving of BN's proposed instruction No. 17.

The railroad complains that proposed instruction No. 18 was not given. That instruction is a statement of a motorist's duty when approaching a railroad crossing and is covered by the instructions given.

The trial court did not err in failing to give BN's proposed instructions.

## DAMAGES

BN's last assigned error claims the trial court erred in failing to vacate the damages award. Plaintiff was awarded $1,135,770, reduced to its present value of $510,000. BN argues that this award is the result of passion or prejudice. Neb. Rev. Stat. § 25-1142 (Reissue 1985) requires a court to vacate an award of damages appearing to have been given under the

influence of passion or prejudice.

A verdict may be set aside as excessive when, and not unless, it is so exorbitant as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. *Pitt v. Checker Cab Co.*, 217 Neb. 600, 350 N.W.2d 507 (1984). This court has held similarly in cases where inadequacy of the verdict is alleged. See, e.g., *Merten v. Pedersen*, 199 Neb. 34, 255 N.W.2d 869 (1977) (asserting that a jury verdict will not be set aside on appeal as inadequate unless it is so clearly wrong and unreasonable as to indicate passion, prejudice, or mistake). We have also suggested that passion or prejudice is shown when the verdict shocks the conscience. See, *Woitalewicz v. Wyatt*, 229 Neb. 626, 631, 428 N.W.2d 216, 219 (1988) (stating that "[t]here is nothing to indicate that the award by the jury is the result of either passion or prejudice, nor does the verdict shock the conscience"); *Steinauer v. Sarpy County*, 217 Neb. 830, 841, 353 N.W.2d 715, 723 (1984) (explaining that "[t]o be sure, at some point the verdict may shock the conscience and, therefore, obviously be excessive").

Based upon the foregoing, we hold that a verdict may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. If a verdict shocks the conscience, it necessarily follows that the verdict was the result of passion, prejudice, mistake, or some other means not apparent in the record. A number of other jurisdictions have adopted this rule. See, *Henninger v. Southern Pacific Co.*, 250 Cal. App. 2d 872, 59 Cal. Rptr. 76 (1967); *Spicer v. Armco Steel Corporation*, 68 Ohio Op. 2d 314, 322 N.E.2d 279 (1974) (involving Ohio rule of civil procedure substantially identical to § 25-1142); *J. V. Harrison Truck Lines, Inc. v. Larson*, 663 S.W.2d 37 (Tex. App. 1983); *Philip Morris Incorporated v. Emerson*, 235 Va. 380, 368 S.E.2d 268 (1988); *Carlson v. BMW Indus. Service, Inc.*, 744 P.2d 1383 (Wyo. 1987).

Regarding the wrongful death of a spouse, this court has held that "[n]othing can be allowed on account of mental suffering or bereavement or as a solace on account of such death." *Ensor v. Compton*, 110 Neb. 522, 524, 194 N.W. 458, 459 (1923). This

same rule was applied to the wrongful death of a child of majority age in *Garvin v. Coover*, 202 Neb. 582, 276 N.W.2d 225 (1979).

Before *Selders v. Armentrout*, 190 Neb. 275, 207 N.W.2d 686 (1973), the sole measure of damages for the wrongful death of a child, other than loss of services during minority, was the loss of contributions that might reasonably be expected to be made after reaching majority. In *Selders, supra,* we first held that the parents of a child whose death was wrongfully caused could recover damages for loss of society, comfort, and companionship of the child. These elements of damages were upheld in *Garvin v. Coover, supra.* In *Garvin*, quoting *Ensor v. Compton, supra,* we admonished, " 'This change, while significant, does not provide a wide open door to all sorts of claims for damages. The loss under the statute is still a pecuniary loss.' " *Garvin, supra* at 585, 276 N.W.2d at 227. We reiterated in *Garvin* that in determining damages in a wrongful death case, " '*[n]othing can be allowed on account of mental suffering or bereavement or as a solace on account of such death.* Only such damages can be recovered as are shown by the evidence to have a monetary value.' " (Emphasis supplied.) *Id.*

The evidence reflects that Dan Crewdson was 21 years old at the time of his death. Though he was living at home at that time, there is no evidence that the decedent, who was gainfully employed, contributed money to his living expenses at his parents' home. He had obtained a high school education. The plaintiff claimed that the decedent's income from full-time employment and from two part-time jobs was $12,000 per year. Although W-2 income tax forms for prior years reflect a maximum of $481 per year from part-time employment, his tax return for 1983 showed no income from any part-time employment. The 1983 income tax return declares a $9,954 gross income from employment.

The decedent also worked part time fixing cars with his father. His father testified that in 1983 his son earned $800 from this part-time work. The decedent's 1983 tax return does not reveal any income from that source. The father testified he paid the income tax on the earnings and gave the decedent the money.

The record reflects that Dan Crewdson's chores around his parents' home consisted of exercising, feeding, and watering the family's two dogs; snow removal; mowing the grass; taking out the garbage; and maintaining a windbreak of 200 trees. His father testified that the decedent helped around the house by doing what needed to be done. Dan Crewdson's parents expected him to provide help to them if they needed it in their later years. The record is vague as to the extent of the help the parents would have received in their later years had the decedent lived. The decedent was engaged to be married after his fiancee graduated from college. She graduated in May 1986. Inferentially, the couple, when married, would establish their own home and any work the decedent did around his parents' home would be considerably diminished.

We conclude that in view of the evidence, the jury verdict in regard to the amount of damages shocks the conscience. The record reflects that Dan Crewdson was an emancipated adult. He did not contribute monetarily to his family. The services he provided his parents would be reduced since he would be marrying in the near future and, by inference, establishing his own residence. Since the award of damages shocks the conscience, it must necessarily be inferred that the jury acted out of passion, prejudice, mistake, or some other means not apparent on the record. After reviewing the damages award as provided by § 25-1142, we find that in this case it is clearly excessive. Unless a court can rationally ascertain the extent of an excessive verdict, a remittitur cannot properly be required. A remittitur would amount only to a substitution of the judgment of the court for that of the jury. *Main v. Sorgenfrei*, 174 Neb. 523, 118 N.W.2d 648 (1962). Although the award is clearly excessive, we are unable to determine the extent of the excess.

The judgment as to damages only is reversed and the cause remanded for new trial only on that issue. The jury's finding on liability has determined that the decedent was not guilty of contributory negligence more than slight, if any. We direct that the jury should be instructed that if it find that the decedent was guilty of contributory negligence, such shall be considered by it only in mitigation of damages and in proportion to the amount of contributory negligence which it may attribute to the

decedent. See, Neb. Rev. Stat. § 25-21,185 (Reissue 1985); NJI2d 2.02A; *Scofield v. Haskell*, 180 Neb. 324, 142 N.W.2d 597 (1966); *Caster v. Moeller*, 176 Neb. 446, 126 N.W.2d 485 (1964).

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR A NEW TRIAL ON THE ISSUE OF DAMAGES.

BOSLAUGH, J., concurring.

I concur fully in the finding in the opinion of the court that, as a matter of law, the award of damages in this case was clearly excessive and that the judgment must be reversed and the cause remanded.

In my opinion it is a very close question as to whether the cause should be remanded with directions to dismiss the petition because the evidence established that the negligence of the plaintiff's decedent, Dan L. Crewdson, was more than slight as a matter of law.

The record shows that the plaintiff's decedent was guilty of substantial negligence which was directly contributory to the accident.

Crewdson lived near the crossing and was very familiar with it and knew of its dangerous nature and the high volume of railroad traffic. Jody Jones, who successfully (rather than "safely") crossed just ahead of Crewdson, testified that she heard the train whistle and saw the glare of its headlight as she approached the crossing. The physical facts were such that her automobile had to be brightly illuminated by the headlight of the approaching eastbound train as she was on the crossing in front of Crewdson, and the headlight should have been apparent to him if he exercised only the slightest of care.

As the opinion points out, all of the positive testimony was that the flagman, Michael Smith, was in position in front of Crewdson and flagging the crossing with a lighted lantern when Crewdson approached the crossing. It seems to me that the circumstances in this case are so different from the facts in *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988), that the *Anderson* case has but little application here.

But if it be conceded that the comparison of Crewdson's

negligence to that of the defendant was a question for the jury, it was, and on remand will be, the duty of the jury under Neb. Rev. Stat. § 25-21,185 (Reissue 1989) to diminish or mitigate the damages to be recovered by the plaintiff in proportion to the amount of contributory negligence attributable to the plaintiff's decedent. To me, it is clear on this record that the jury made no allowance for the negligence of the plaintiff's decedent in fixing the amount of the damages it awarded.

HASTINGS, C.J., joins in this concurrence.

SHANAHAN, J., dissenting.

This court correctly affirms the judgment concerning liability for the death of Dan L. Crewdson, but incorrectly sets aside the verdict for damages.

In rationalization for vacating the damages verdict, the majority, envisioning a predetermined relationship between Dan Crewdson and his parents after Dan's marriage to Jody Jones, foretells: "Inferentially, the couple [Jody and Dan], when married, would establish their own home and any work the decedent did around his parents' home would be considerably diminished," and "[t]he services he provided his parents would be reduced since he would be marrying in the near future and, by inference, establishing his own residence."

However, nothing in Dan's conduct remotely indicates that after his prospective marriage, Dan's relationship with his parents would have been any different regarding the services he was rendering for his parents and the help he was providing. Eventual diminution of the relationship between the Crewdsons, which the majority characterizes as an inference, but which is more properly classified as prognostication or indulgence in an unwarranted assumption, is assuredly disregard for "Honor thy father and thy mother," a mandate which contains no exemptive contingency "until thou art married." As the majority perceives the situation, wedding bells for Dan Crewdson would have been the death knell for his filial assistance to Dorothy and Marvin Crewdson, his parents.

The evidence clearly establishes that Dan and Marvin worked closely in a part-time auto repair business, which produced approximately $3,600 annually before Dan's death.

That repair business was cut in half by Dan's death. Dan was also helpful around his parents' home—removing snow, taking care of the yard, maintaining a 200-tree windbreak, making household repairs, and doing any other task his father was unable to perform. According to Dorothy Crewdson, undoubtedly Dan would have supplied a helping hand in any of his parents' needs. More simply expressed by Marvin Crewdson, if there was any household chore to be done, Dan "would be there," while Dorothy Crewdson observed that if she had any problem, Dan would be "[r]ight by my side." Without question, the past was a sign of the future between Dan and his parents.

In *Garvin v. Coover*, 202 Neb. 582, 586, 276 N.W.2d 225, 227 (1979), referring to the question of damages in a wrongful death action, this court noted, "It is virtually impossible to 'color match' cases in attempting to decide a given issue," and then stated:

> [D]amages in any wrongful death case are incapable of computation and are largely a matter for the jury. In Selders v. Armentrout [192 Neb. 291, 220 N.W.2d 222 (1974)], this court said: "The amount which should be awarded in any wrongful death case is incapable of computation and is largely a matter for the jury. As stated in Dorsey v. Yost, 151 Neb. 66, 36 N. W. 2d 574, 14 A. L. R. 2d 544: 'The amount to which a parent is entitled cannot be accurately determined because of the numerous contingencies involved. The amount being very problematical, it is peculiarly for the jury to determine, after hearing all the evidence bearing upon the situation, including the parent's position in life, the physical and mental condition of the child, his surroundings and prospects, and any other matter that sheds light upon the subject. Members of juries generally have children of their own and have information as to the pecuniary value of children's services and the expense involved in their care and education. A jury is peculiarly fitted to determine the loss sustained by a parent in such a case. At best, the verdict can only be an approximation as no yardstick exists by which the correct answer can be found with

exactness.' . . ."
*Garvin* at 586-87, 276 N.W.2d at 227.

As one commentator has observed:

> The action for wrongful death is sui generis. Because of the difficulty in placing a monetary value on the human life, and the speculative or, more accurately, the nonmathematically calculable—nature of damages, where recoverable, for mental anguish or loss of love and affection, the measurement of such damages is left to the jury. The jury is not bound by any fixed or precise mathematical rules in estimating the amount of damages. It possesses discretion, and it is given wide latitude to exercise its sound judgment and good sense, aided by proper instructions from the court.

2 S. Speiser, Recovery for Wrongful Death § 9:2 at 3-4 (2d ed. 1975).

As a consequence of Dan Crewdson's death and the evidence of his relationship with his parents, the loss to Dorothy and Marvin Crewdson was a matter for measure by the jury, not by this court. Since there is no objective justification for setting aside the verdict for damages, the district court's judgment should have been affirmed in all respects.

GRANT, J., joins in this dissent.